## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | |
|---|---|
| **AMERICAN VENDING GROUP, INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. WGC-07-2277** |
| | ) |
| **UNITED STATES** | ) |
| | ) |
| **Defendant.** | ) |

_____)

### MEMORANDUM OPINION

On August 1, 2008 a motions hearing was held regarding Defendant's motion for summary judgment.  On August 28, 2008 the Court issued a memorandum opinion and an order denying Defendant's motion for summary judgment.  *See* Document Nos. 31 - 32.  On November 19, 2008 a bench trial was held before the undersigned.

### A.   Bench Trial

1.      The following witness testified:

John Blick

2.      Several exhibits were admitted during trial specifically:

Exhibits 101, 113A, 117, 120 and 123

3.      Ellen C. Rorrer's testimony was taken by deposition *de bene esse*.  The transcript of this deposition was not available at the time of trial.

4.      Based on the testimonial and documentary evidence, the undersigned makes the following findings of fact and conclusions of law.

### B.  Findings of Fact

5.      Mr. Blick's wife worked as a manager of a hotel in Lanham, Maryland.  Mrs. Blick

typically worked in the evenings.  For safety reasons Mr. Blick accompanied his wife to her work

site.

6.      Mr. Blick noticed many individuals purchasing items from the vending machines at

the hotel.  Mr. Blick inquired about stocking the vending machines and subsequently started his

vending machine business.

7.      In 1997 or 1998 a friend's brother lost his job and inquired about working with Mr.

Blick's vending machine business.  Meanwhile, on the commercial real estate side, there were

more opportunities for Mr. Blick but he did not have the time or energy to pursue those

opportunities.  Thus Mr. Blick and his friend's brother teamed up in an attempt to expand the

vending machine business resulting in the formation of American Vending Group, Inc.

("American Vending") in 1998.

8.      Mr. Blick was not actively involved in the day-to-day operations of American

Vending.  Mr. Blick's main business was commercial real estate.  Mr. Blick assumed management

of bookkeeping and other similar duties on behalf of American Vending.

9.      Mr. Blick testified that he did not know anything about bookkeeping, about sales

tax, about payroll and that is why he hired Ellen Rorrer because he lacked accounting and

bookkeeping knowledge for his company.

10.      Mr. Blick has a degree in Business Administration from the University of

Maryland.  Mr. Blick testified he took two accounting courses in college; one of the courses he

failed and had to retake.

11.     Ms. Rorrer worked for American Vending for part of 1998 and part of 1999.  At some point in 1999 American Vending changed to a payroll service.

12.     According to Mr. Blick Ms. Rorrer would do the general bookkeeping, fill out sales tax forms that had to be paid quarterly as well as the tax returns for the end of the year.

13.     According to Mr. Blick his original intent was for Ms. Rorrer to come to the work site every week or every two weeks.  Ms. Rorrer instead stopped by once every month and by the end of the relationship Ms. Rorrer stopped by once every three to four months.  Mr. Blick had a lot of problems and testified that "some things got very messed up."  These difficulties with Ms. Rorrer prompted Mr. Blick, on behalf of American Vending, to retain the payroll service.

14.     Exhibit 117 is a PayTrak Service Agreement.  This document shows that on March 22, 2000 American Vending secured the payroll services offered by PayTrak.  Mr. Blick confirmed that this exhibit is the contract he signed on behalf of American Vending hiring the payroll service.

15.     According to Mr. Blick PayTrak took care of everything related to payroll.  Mr. Blick had to provide this service certain information (amounts of money needed to be paid, information about the employees, the number of deductibles).  Every other week PayTrak would overnight to Mr. Blick the employees' paychecks and stubs.

16.     Since retaining PayTrak American Vending has not had any Internal Revenue Service's ("IRS") penalties or interests assessed.

17.     According to Mr. Blick the wife of his partner (commercial real estate business) gave a tax form to Mr. Blick as an independent contractor which made Mr. Blick realize he needed to give a tax form to the employees of American Vending.  Mr. Blick in turn called Ms. Rorrer

3

stating American Vending needs to distribute the tax form to its employees.  Mr. Blick does not recall exactly when Ms. Rorrer provided the forms but once he received the Internal Revenue Code ("IRC") Form W-2's, *Wage and Tax Statement*, ("W'2's") he tracked down the employees and gave them the W-2s.

18.     Mr. Blick was not aware of any other requirement besides delivering the W-2s to American Vending's employees.  He was not told there was anything else that had to be done.  Mr. Blick specifically testified that Ms. Rorrer never told him that he had to submit anything else.

19.     Mr. Blick does not recall Ms. Rorrer providing him IRC Form W-3, *Transmittal of Wage and Tax Statement*, ("W-3" or "W-3 transmittal return").

20.     Mr. Blick denied having knowledge, in 1998, of the W-3 transmittal return.

21.     Mr. Blick denied having any record of filing a W-3 transmittal return for 1998.

22.     Before 1998 Mr. Blick never had to file a W-3 transmittal return.

23.     Mr. Blick does not recall receiving any instructions from Ms. Rorrer about the 1998 W-3 transmittal return.  Mr. Blick testified that while Ms. Rorrer worked for American Vending he regularly paid sales tax as instructed by Ms. Rorrer.  Thus if he had been given the W-3 transmittal return, he would have signed it and mailed it as he did with other paperwork Ms. Rorrer prepared for American Vending.

24.     Mr. Blick testified that the mailing address for American Vending was his home address, 4 Nocturne Court, Rockville, Maryland 20850 ("4 Nocturne Court").  The mailing address did not change and was thus consistent until 2005 or 2006.  All forms related to American Vending were sent to that mailing address.  However the physical location of American Vending changed several times.  Mr. Blick explained this his business was changing significantly, from

working for another company to establishing his own business and since he was just starting and the company was young, Mr. Blick subleased space and thus moved quite often.  The place where Mr. Blick conducted his business was at the office.  Any paperwork Mr. Blick received at home for American Vending he took to the office.

25.     Mr. Blick testified that he was first contacted by the IRS in 2001.

26.     Mr. Blick testified that American Vending did not receive any communication from the IRS or the Social Security Administration before the December 3, 2001 Notice of Penalty Charge (Exhibit 101).  This Notice of Penalty Charge was mailed to American Vending at the following address:  6701 Democracy Boulevard [Suite] 555, Bethesda, Maryland 20817 ("6701 Democracy Boulevard").

27.     That the IRS sent the December 3, 2001 Notice to the 6701 Democracy Boulevard address is inconsistent with Mr. Blick's testimony that the mailing address for American Vending was the 4 Nocturne Court address.

28.     Mr. Blick testified that the IRS penalty ($4,119.79) was taken from American Vending's banking account.

29.     Subsequently Mr. Blick, on behalf of American Vending, submitted IRC Form 843, *Claim for Refund and Request for Abatement* (Exhibit 120).  As listed on the form American Vending seeks a refund or an abatement in the amount of $4,019.79.

30.     Mr. Blick recalled that Ms. Rorrer would either hand deliver to him or leave on his desk quarterly tax returns she prepared in 1998.  Mr. Blick could not recall whether Ms. Rorrer provided an envelope with the quarterly tax returns.

31.     Mr. Blick does not specifically remember Ms. Rorrer leaving the W-2s on his desk.

32.     Mr. Blick acknowledged reading the W-2s to ensure he gave the appropriate form to each employee.

33.     Six days before the bench trial Ms. Rorrer's deposition was taken.

34.     Ms. Rorrer described the bookkeeping service she provided to Mr. Blick and American Vending as follows: "Getting his work set up on the computer.  Trying to get his fixed assets identified and get a depreciation schedule.  Started doing payroll.  Doing his payroll, tax returns, preparing them for him, W-2's, bank rec's."  Transcript ("Tr.") at 5:15 - 19.

35.     Ms. Rorrer described her normal business practice of providing instructions to clients for filing returns.  "When I would do the returns for clients I would make copies for them. I would put envelopes with the returns and paper clip them.  And I would put a post it telling them what it was.  And I would cut the checks for them.  At least for most clients I would cut checks." Tr. at 9:11 - 16.

36.     Ms. Rorrer provided an overview to Mr. Blick, an overview that she gave to every new client.  "I explained to him how Social Security and Medicare works, that you withhold a certain amount from your employees, but then at the same time he matches it.  I told him about unemployment.  I told him how it worked.  Told him, obviously, that we had to do W-2's at the end of the year.  Told him that payroll tax returns were done on a quarterly basis."  Tr. at 17:25 - 18:7.

37.     The following exchange occurred between Ms. Rorrer and counsel for the United States.

Q:  With every brand new client do you discuss the fact that you have to file W-2's and send them in to the Social Security Administration

with a form W-3?

A:  No, I don't get that specific.

Q:  Okay.  Do you explain that you have general filing requirements with regard to your W-2's?

A:  Yes.  I explain the – – it's done on a quarterly basis.  And I will try and educate them as much as what I can, but typically when it's a brand new customer and they've had absolutely no payroll whatsoever, you go through it a couple of times.

Q:  You go through the explanation?

A:  Oh, yes.

Q:  A couple of times throughout the year?

A:  When it becomes appropriate.

Q:  Okay.  Would you have discussed at any point the need to file W-2's and W-3's?

A:  Probably.  I can't remember exactly, but probably the only thing I said was at the end of the year we're required to file W-2's, that you give – – you have to, you know, give some to your employees and some we have to file with various taxing [departments].

Q:  So you would have told him that?

A:  Oh, yes, but I wouldn't have gotten any more specific except quote general taxing departments.

Tr. at 18:17 - 19:16.

38.     Ms. Rorrer testified that she never handed Mr. Blick a return.  She always left the item on his desk.  Tr. at 11:1 - 3.[1]

---

[1] Q:  If you did not personally hand that to Mr. Blick, the 1998 W-3 transmittal, how did you provide it to him?

A:  Put it on his desk.

Q:  Where did you put the 1998 transmittal return to Mr. Blick?

39.     Ms. Rorrer described Mr. Blick's desk as "horribly messy."  Tr. at 21:20 - 22.

40.     In another exchange between Ms. Rorrer and counsel for the United States Ms.

Rorrer recalled the manner in which she provided the W-2's and W-3's to Mr. Blick.

> Q:  For the W-3, would you have put that form with the W-3 and W-2
> when you would have prepared them?
>
> A:   Sometime in the month of January.
>
> Q:   Okay.  What would you have done with the W-2 and W-3?
>
> A:   Say that again.
>
> Q:   What would you have done with the W-2 and W-3?
>
> A:  Exact same procedure.  I would have left it on John [Blick]'s desk.
> I would have left the W-2's for employees on John's desk.  There
> wouldn't have been any change in procedure.
>
> Q:   So they would have been on his desk?
>
> A:   Yes.
>
> Q:   With an envelope for the W-3?
>
> A:   Yes.
>
> Q:   Pre-addressed?
>
> A:   Yes.

---

A:  Where?

Q:  Uh-huh.

A:  I said I put it on his desk.

Q:  I know, but where was the desk?

A:  In his office.

Tr. at 14:8 - 18.

Q:  And you wouldn't have stuck it underneath stacks of paper?

A:  No.

Q:   You wouldn't have taken the W-3 and say put it two feet away
from the W-2's?

A:  No.

Q:  The W-2's and W-3's would have been close together?

A:  Probably one on top of the other.

Q:  So if – – which one would have been normally put on top?

A:  I don't remember.  That I really don't remember.

Q:   If – – all right.  So if they were on top – – if the W-2's were on
top, Mr. Blick, if he had seen the W-2's and lifted them up, the W-3
would have been underneath?

A:   Either the W-3 would have been on top or the W-3 would have
been on the bottom.

Q:  Okay, but do you ever remember Mr. Blick saying – – calling you
in January 1999 and saying I don't know what this form is?

A:  No, I don't remember that.

Tr. at 22:1 - 23:17.

41.      Ms. Rorrer does not recall if she gave written or oral instructions to Mr. Blick

about filing the W-3 transmittal return.  Tr. at 11:9 - 12; 13:24 - 14:2.

42.      Ms. Rorrer cannot say with certainty that Mr. Blick received the W-3 transmittal

return.  She left the W-3 transmittal return on his desk.  She has no knowledge about what

happened after she left the W-3 transmittal return on Mr. Blick's desk.  Tr. at 15:18 - 23.

43.      The Court notes that the events at issue in this case transpired ten years ago.

44.      The two witnesses' recollections differ.  Ms. Rorrer testified that she left the W-2's

and the W-3's on Mr. Blick's desk whereas Mr. Blick does not recall Ms. Rorrer leaving the W-2's on his desk.

45.     The Court finds by a preponderance of the evidence that Ms. Rorrer prepared the 1998 W-2's and W-3's for American Vending and left these forms on Mr. Blick's desk in his office.

46.     The Court finds by a preponderance of the evidence that Mr. Blick received the 1998 W-2's prepared by Ms. Rorrer and distributed the W-2's to American Vending's two employees.

47.     Considering that Mr. Blick paid quarterly taxes and submitted paperwork as instructed by Ms. Rorrer, that Mr. Blick desk was "horribly messy," that Ms. Rorrer recalled preparing the 1998 W-3's, that Ms. Rorrer recalled placing the 1998 W-3's on Mr. Blick's desk along with the 1998 W-2's, that Mr. Blick received the 1998 W-2's Ms. Rorrer prepared and distributed them to the employees, that Mr. Blick does not recall receiving the 1998 W-3's, and that Mr. Blick was operating a commercial real estate business which consumed the majority of his time, the Court finds by a preponderance of evidence that the 1998 W-3's prepared by Ms. Rorrer very likely were misplaced.

48.     The cost of complying with the filing requirement for the W-3 transmittal return is the cost of postage.

## C.  Conclusions of Law

49.     "[A]n assessment of the Commissioner is presumptively correct and the taxpayer has the burden of proving it wrong." *Faulconer v. Commissioner*, 748 F.2d 890, 893 (4th Cir. 1984).  If the assessment is arbitrary however the presumption that the IRS' assessment is correct

does not apply.  *Dellacroce v. Commissioner*, 83 T.C. 269, 1984 WL 15606 (Tax Court 1984).

50.      The IRS has authority to impose a penalty against a taxpayer who fails to file an information return pursuant to 26 U.S.C. § 6721.  A higher penalty may be assessed against a taxpayer who intentionally disregards filing an information return.  *Id.* § 6721(e).

51.      Section 6721 of Title 26 of the United States Code does not define the phrase "intentional disregard."  The Court must look to the Regulations for guidance.

52.      "Intentional disregard" is defined in 26 C.F.R. § 301.6721-1(f)(2).

A failure is due to intentional disregard if it is a knowing or willful —

(i) Failure to file timely, or

(ii) Failure to include correct information.  Whether a person knowingly or willfully fails to file timely or fails to include correct information is determined on the basis of all the facts and circumstances in the particular case.

53.      The facts and circumstances to consider in determining whether a failure is due to "intentional disregard" are listed in 26 C.F.R. § 301.6721-1(f)(3).

The facts and circumstances that are considered in determining whether a failure is due to intentional disregard include, but are not limited to —

(i) Whether the failure to file timely or the failure to include correct information is part of a pattern of conduct by the person who filed the return of repeatedly failing to file timely or repeatedly failing to include correct information;

(ii) Whether correction was promptly made upon discovery of the failure;

(iii) Whether the filer corrects a failure to file or a failure to include correct information within 30 days after the date of any written request from the Internal

Revenue Service to file or to correct; and

(iv) Whether the amount of the information reporting penalties is less than the cost of complying with the requirement to file timely or to include correct information on an information return.

54.     The Court concludes by a preponderance of the evidence that American Vending's failure to file the 1998 W-3's is not part of a pattern of conduct.  The failure to file the W-3 transmittal return was the first and only occurrence.  This factor favors American Vending.

55.     The Court concludes by a preponderance of the evidence that American Vending never independently realized that it failed to file the 1998 W-3 transmittal return.  This factor is not applicable to the facts of this case.

56.     The Court concludes by a preponderance of the evidence that American Vending did not take corrective action within 30 days of receiving the December 3, 2001 Notice of Penalty Charge. This factor favors the United States.

57.     The Court concludes by a preponderance of the evidence that any rational taxpayer would comply with the reporting requirement and avoid the risk of a significant penalty.  The reporting requirement would have been the cost of postage.  American Vending's penalty totaled $4,119.79.  This factor favors American Vending.

58.     The Second Circuit has defined the phrase "intentional disregard" in 26 U.S.C. § 6721 which this Court finds persuasive.  "[T]he 'intentional disregard' set forth in § 6721's penalty provision means conduct that is willful, a term which in this context requires only that a party act voluntarily in withholding requested information, rather than accidentally or unconsciously."  *Gerald B. Lefcourt, P.C. v. United States*, 125 F.3d 79, 83 (2d Cir. 1997).

59.     The Court concludes by a preponderance of the evidence that Mr. Blick, on behalf

of American Vending, desired to comply with the reporting requirement by retaining Ms. Rorrer

to handle the accounting for American Vending.  *See Tysinger Motor Company, Inc. v. United*

*States*, 428 F. Supp. 2d 480, 485 (E.D. Va. 2006).

60.     The Court concludes by a preponderance of the evidence that American Vending

has demonstrated that it did not voluntarily withhold the W-3 transmittal return.

61.     The Court concludes by a preponderance of the evidence that American Vending's

failure to file the 1998 W-3 transmittal return was accidental.

62.     Because American Vending did not act with "intentional disregard"in failing to file

the W-3 transmittal return, American Vending should have been assessed a penalty of $50 for

each return pursuant to 26 U.S.C. § 6721(a)(1).  American Vending should have filed two W-3's

for tax year 1998.  Thus the maximum penalty assessed should be $100.

63.     Judgment will be entered in favor of American Vending and against the United

States.

64.     By separate Order American Vending will be awarded $4,019.79 plus prejudgment

interest to run from the date that American Vending paid the penalty.


March 27, 2009                                                    /s/
_____                      _____
    Date                                                    WILLIAM CONNELLY
                                                UNITED STATES MAGISTRATE JUDGE